JAMES B. WHITE *et al.*

*v.*

ALEXANDER ROSS.

*Filed at Ottawa October 26, 1893.*

1.  WITNESS—*competency of party in behalf of co-defendant, in chancery.*  A defendant in chancery is a competent witness to testify in behalf of a co-defendant on any question in which he has no interest, and section 1 of the act in relation to evidence and depositions in civil cases has in no manner changed that rule.  Nothing in that act contained indicates an intention to render any witness incompetent in any case, when, in the absence of the statute, he was and had been competent.

2.  Under the practice in chancery a defendant might always testify for a co-defendant if his evidence did not necessarily involve his own interest, otherwise a complainant might prevent a witness from testifying, simply by making him a defendant to the bill.  Hence the inquiry is not so much whether the name of the witness appears upon the record, as whether he is in fact swearing to promote his own interest.

3.  In chancery a witness is not disqualified merely because he has an interest in the event of the suit, but his interest must be against the party whose interests are sought to be prejudiced by his testimony. And even when the witness has an interest in favor of the party calling him, he may still be competent if it appear that he has an equal interest on the other side.  If his interests are equally balanced, and his mind is in a state of equipoise, which leaves him indifferent to the result, he is competent.

4.  Where a defendant in a bill in chancery does not dispute his liability to account, and the only question is to which of two parties he is liable,—the complainant or a co-defendant,—he will be a competent witness, his interest being equally balanced.

5.  On bill by one of several heirs to set aside her deeds to her mother, on the ground that they were procured by fraud and imposition, and seeking for an accounting by one of her brothers, the latter is a competent witness for his co-defendants, to show that there was no fraud and imposition practiced upon the complainant, it being shown that he had conveyed all his interest in the estate of the mother.  In such case his interest is equally balanced.

6.  EVIDENCE—*to disprove fraud and imposition in procuring execution of a deed.*  On bill to set aside a deed on the ground its execution was procured by fraud, undue influence and imposition, it appeared that

the complainant joined with all her brothers and sisters in the deed, for the purpose of conveying their estate, inherited from their father, to their mother: *Held,* that the defendants might show, in defense, the circumstances attending the execution of the deed, and that the matter was talked over by the grantors among themselves, and that they all agreed that the conveyance was proper, and that the complainant joined in the deed voluntarily, and without dissent or persuasion.

APPEAL from the Circuit Court of Cook county; the Hon. EDWARD P. VAIL, Judge, presiding.

Mr. IRA W. BUELL, for the appellants:

It is well settled that sections 1 and 2 of chapter 51 of the statutes do not render a witness incompetent who was competent before their enactment. *McKay* v. *Riley,* 135 Ill. 586; *Bradshaw* v. *Combs,* 102 id. 428; *Caprez* v. *Trover,* 96 id. 456.

Neither do they change the law as to the extent of the right or mode of cross-examination. *Butz* v. *Schwartz,* 135 Ill. 180; *Jackson* v. *Varrick,* 7 Cow. 238; *Fulton Bank* v. *Stafford,* 2 Wend. 483; *Floyd* v. *Bovard,* 6 W. & S. 75.

Mr. SIDNEY SMITH, also for the appellants:

Alexander White was a competent witness. *Bradshaw* v. *Combs,* 102 Ill. 428; *Smith* v. *West,* 103 id. 332; 1 Greenleaf on Evidence, sec. 386.

Mr. WILLIAM R. PLUM, and Mr. WILLIAM P. BLACK, for the appellee:

Alexander White and Elsie White were incompetent witnesses for appellants as to matters occurring before the death of Annie and of Ann, not adverted to in their direct examination, because they were interested parties herein, and they were not made competent, generally, because called by appellees on certain points. *Langley* v. *Dodsworth,* 81 Ill. 86; *Monroe* v. *Napier,* 52 Ga. 388; *Baker* v. *Kuhn,* 38 Iowa, 395; *Runnels* v. *Belden,* 51 Texas, 48; *Everly* v. *Cole,* 3 Green, (Ia.) 239; *Arthur* v. *Blunt,* 12 Iowa, 200; *Pickering* v. *Miner,* 11 Ill. 597.

But even if competent they were only so to prove the defense made by their pleadings.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

The original bill in this case was brought by Annie C. White against James B. White and numerous other defendants, for the purpose of setting aside certain conveyances, and of ascertaining and obtaining possession of the complainant's share of the real and personal estate of her father, Alexander White, deceased, and for an accounting. Shortly after the bill was filed, the complainant intermarried with Alexander Ross, and she thereupon executed a deed conveying to one Carter, who conveyed to her husband, the property in controversy, the title thus acquired by her husband being, as is conceded, only in trust for her. At the same time she made and published her last will and testament, making her husband her sole legatee and devisee. After various amendments to the pleadings the complainant died, and her husband, as her sole legatee and devisee, was substituted as complainant. The cause being afterward heard on pleadings and proofs, a decree was entered in accordance with the prayer of the bill, and James B. White and others of the defendants now bring the record to this court by appeal.

The facts, so far as necessary to a proper understanding of the questions presented by the appeal, are briefly these: On the 18th day of March, 1872, Alexander White, who then resided at Lake Forest, Lake county, died intestate, leaving a large estate, consisting of both real and personal property, and leaving him surviving, Ann White, his widow, and his children, two sons and four daughters, viz., Margaret, Elsie, Alexander Jr., Mary S., Annie C. and James B. White. All the children were then of age, except Annie C., who was then nearly seventeen years old, and James B., who was in his sixteenth year. Margaret was an insane person, and several

years prior to the death of her father had been committed to an insane asylum at Litchfield, Connecticut, where she remained until her death, which took place February 20, 1883.

Alexander White Jr., being the eldest son, was, at the instance and on the recommendation of his mother, appointed administrator of his father's estate by the County Court of Lake county. Not only did he act as administrator under this appointment, but with the approval if not at the express request of his mother, brother and sisters, he undertook the management of their business affairs, making improvements, collecting rents, paying taxes and causing repairs to be made, and also exchanging certain securities held by him as administrator for real property, and selling the homestead at Lake Forest and taking in part payment therefor certain other real estate, the title to the real estate thus purchased being taken in his own name. In 1878, in partition proceedings had in the Circuit Court of Cook county, the dower of the widow was set off and assigned to her, and the shares of Alexander and Margaret in the real property belonging to the estate were set off to them respectively in severalty, and the shares of Elsie, Mary S., James B. and Annie C. were set off to them together, to be held by them as tenants in common.

The estate was not settled, nor did Alexander White Jr. render any account, either as administrator or as the agent of his mother, brother and sisters, until July, 1879. Upon an accounting then had, it was found that he had squandered and dissipated most if not all the personal estate, and had also misappropriated and lost the rents collected, the amount of funds in his hands as administrator thus misappropriated being $129,769.65, less his share of $14,418.87, and the amount of rents $118,637, less his share thereof, the aggregate of his defalcations being $214,214.78. To pay and satisfy his liability thus arising to his mother, brother and sisters, he conveyed to his brother and sisters all his real estate, being the real estate which had been set off to him in the partition

proceedings, one deed being executed to Margaret, conveying her portion in severalty, and another deed being executed to Elsie, Mary S., James B. and Annie C., conveying to them their portions to hold as tenants in common. To his mother, whose portion of the personal property misappropriated by him as administrator was $43,256.61, he turned over certain shares of stock and commercial paper, including among the latter a promissory note of McClellan and Jenkins, taken as part of the consideration for the sale of the Lake Forest homestead.

The settlement being made, Alexander White Jr. seems to have been relieved of any further control of the estate, and the properties which then belonged to his brother and sisters, together with that which had been set apart and assigned to his mother as her dower, were placed in charge of James B. White, under an arrangement by which he was to manage and control the same, collect the rents, and deposit all moneys received in a bank to the joint credit of himself and his sister Elsie, the same to be drawn only on their joint check.

It appears that Alexander White Jr., while in charge of the estate, had become largely indebted to other parties besides the members of his family with whom settlement was made as above stated, and among his creditors was W. F. Cotzhausen, of Wisconsin, who having obtained judgments against him aggregating $27,000, filed his bill against him, his mother, brother and sisters seeking to have the settlement declared void under the statute in relation to voluntary assignments for the benefit of creditors, as being an unlawful preference. This suit was removed by Cotzhausen from the Circuit Court of Cook county to the Circuit Court of the United States for the Northern District of Illinois, where it remained pending until a hearing was had, resulting in a decree in favor of Cotzhausen. That decree was taken by appeal to the Supreme Court of the United States, where it was finally affirmed January 28, 1889. *White* v. *Cotzhausen,* 129 U. S. 329.

While the Cotzhausen case was pending in the Federal ·Courts, and matters were in the situation above described, a scheme was set on foot by James B., Elsie and Mary S. White, to have all the estate derived from their father, both real and personal, so far as the same then remained, conveyed and transferred to their mother, so as to vest in her the same title thereto which she would have had if her husband had devised and bequeathed the same to her by will. This plan seems to have resulted from the apprehensions created by the financial ·disasters attending Alexander's management of the estate, together with the annoyance and anxiety growing out of the Cotzhausen litigation, coupled with the fear that James B. or some of the others might make mistakes similar to those which Alexander had made. It was also urged as a further consideration, that the property had been acquired by the joint labor and economy of their father and mother, and they claim to have been moved thereto by the natural love, affection and confidence reposed by them in their mother. The evidence tends to show that this plan was discussed in the family for several months, the mother and all the children, with the exception of Margaret, then living together in the same family, and that Annie C. White was present at such discussions, and while she does not appear to have suggested, urged or discussed the plan, the evidence tends to show that she assented ·to it.

These discussions resulted in the execution by Elsie, Mary S., James B. and Annie C. White of a bill of sale, bearing date July 12, 1882, transferring to their mother certain paintings of considerable value, and also as the evidence tends to show and as the court below found, in the execution by the same parties of a deed, bearing date July 14, 1883, conveying, in consideration of one dollar and natural love and affection, to Ann White, their mother, all the property which had been ·set off to them in the partition proceedings, and also that ·conveyed to them by Alexander. This deed, as the evidence

tends to show, was duly acknowledged and delivered, but was never recorded.

The reason why it was not put on record, as now given, is as follows: Contracts had been made or were in course of negotiation, for subdividing portions of the property conveyed, and leasing the same on long time, the lessees to improve the property by borrowing money on notes and mortgages executed by the lessor, the making of which notes, mortgages and leases would necessarily involve the signing of many papers, which Mrs. White, owing to her age and infirmities, could do only with great difficulty. Accordingly, a deed was also executed conveying those portions of the real estate, being the properties known as the Wabash avenue and the Warren avenue properties, to Elsie White, she to execute the papers necessary to carry out the arrangements in that behalf, and then convey the property to her mother.

Between July 14, 1883, and the early part of the year 1888, several pieces of property included in the general deed of July 14, 1883, were sold or otherwise disposed of, and in the early part of the year 1888, Elsie, Mary S., James B. and Annie C. White each executed separate deeds to their mother, conveying to her all the property remaining undisposed of, being the property then standing of record in their names, the consideration stated in the deeds being one dollar and natural love and affection. The deed from Annie C. White to her mother bore date January 18, 1888, and it is claimed by the defendants that this deed, and those executed by her brother and sisters at about the same time, were executed by way of confirmation of the deed of July 14, 1883, that deed being now lost, and the fact that it ever existed even being in dispute.

The principal controversy in the case is over these two deeds from Annie C. White to her mother, it being claimed that they were executed by her without any proper knowledge or information on her part of the nature, character or value of the property she was thus conveying, and without being ad-

28—147 ILL.

vised or knowing the legal effect of the deeds.  At the date
of the first deed, she was about twenty-eight, and at the date
of the second deed, about thirty-three years of age, but it is
claimed that, though of mature years, she was in matters re-
lating to business but a mere child, and that the fiduciary
relation ordinarily existing between parent and child existed
in its full vigor between her and Mrs. White, her mother, at
the time of the execution of these deeds, and that, up to the
time of their execution, she was not in fact, in any sense of
the word, an independent woman, but was dependent upon
and confiding in her family.

The bill alleges that Annie C. White had always been unac-
customed to business matters, having relied upon her brother
Alexander until July, 1879, to conserve her interests, and af-
terwards upon her brother James and her sister Elsie, and
that they had wholly failed and neglected to consult with her
as to her rights in the premises, or to account for her share
of the rents and profits or other rights, titles and interests,
and that she had not been advised thereof by her mother,
brothers or sisters, but kept in great ignorance thereof, and
that she believed herself largely dependent upon them ; that
by reason of her great ignorance concerning her rights, and
of her absence from the State of Illinois a great portion of
the time by connivance of her mother, James and Elsie, (she
having lived a large portion of the time for several years prior
to January 18, 1888, in the city of New York), she was easily
prevailed upon to execute many papers, the purport of which
she did not know ; that she was kept in ignorance of the values
of her property, information concerning such values having
been studiously kept and concealed from her by her mother,
brothers and sisters, to the end that her properties, rights
and interests could be more completely and easily handled by
them ; that she had been deceived and misled by them into
conveying large portions of her estate, which conveyances
should be set aside ; that in these several matters, she did not

have the advice or assistance of any person other than her mother, brothers and sisters, and that in all her actings and doings, she acted according to their suggestions, and particularly of her brother James, her sister Elsie and her mother, supposing at all times that they meant to secure, protect and advance her best interests, and to deal fairly with her; that they well knew at all times when she executed papers as aforesaid, that she would not have executed them or any of them except to conserve, promote and advance her interests, as she was informed and advised she was doing; that James and Elsie at all times since July, 1879, sustained fiduciary relations towards her, and have been controlling properties for her as agents or trustees; that by reason of the inordinate cupidity of Alexander, Elsie and James, they were constantly poisoning the mind of their mother against her, and leading her mother to distrust her, and to join with them in a crusade against her properties, and to keep her away from her mother and home, and that she was wholly unsuspicious of these evil designs, until long after the execution of every paper presented to her for her signature.

The bill makes the complainant's mother, her brothers including Alexander, her sisters, and a large number of other persons, parties defendant, but no relief is prayed as against her brother Alexander except, for the appointment of a receiver to collect and get in all outstanding debts and moneys due the complainant's mother, her brothers, sisters and herself, on account of their individual interests in the estate, and for an order requiring Elsie, Mary S., James B. and Alexander White to produce and deliver up to the receiver for inspection, examination and other lawful purposes, all books of account, vouchers, letters, deeds and other instruments or papers affecting the estate of the complainant, in their possession or power.

On the 26th day of April, 1890, and while the suit was pending, Ann White, the complainant's mother, died, leaving

her last will and testament, by which she devised and bequeathed her entire estate to her son, James B. White, and her two daughters, Mary S. and Elsie White, and appointing James B. and Elsie her executors.

At the hearing, Alexander White was called and sworn as a witness on behalf of the complainant, to prove the handwriting of certain letters purporting to have been written by him, and which, upon being thus proved, were admitted and read in evidence. He was afterwards called as a witness for the defendants, and was examined, without objection, in relation to certain conversations and transactions between him and his sister Elsie, the original complainant, and Alexander Ross, in 1879, at about the time of their marriage, and as to which the complainant's witnesses had already testified. The counsel for the defendants then asked him this question:

"Did you know of the preparation and execution of a deed from your sisters Annie, Elsie and Mary and your brother James B. White to your mother, dated July 14, 1883, conveying the property set off in the partition suit to these four grantors, and also the property which you have conveyed to them, which had been set off to you in the partition suit; I speak of the deed in this way to identify it; do you know of the preparation and execution of that deed?"

This question was objected to by the complainant's counsel on the grounds that the witness was a party to the suit and directly interested in the result thereof; that under the statute he was not qualified as a witness; that he was an heir of his sister Margaret, and a conspirator in this whole matter, and liable to an accounting, etc.; that he disposed of certain property of Ann White under a power of attorney from her, and that the avails of that property have never been accounted for.

In support of these objections, the complainant's counsel examined the witness as to his competency, and upon such examination, it appeared that the witness, in his mother's lifetime, held a warrant of attorney from her, authorizing him to

dispose of three certain pieces of real property, and that in pursuance of such warrant of attorney, he entered into a contract with William G. Waddell, by which he gave Waddell an option to purchase the three properties for $65,000, payable in five years, with annual interest at the rate of six per cent, or to lease them for ninety-nine years at five per cent on $65,000; that the contract, as executed, run to the witness, although it was really executed by him on behalf of his mother; that in 1890, after the death of his mother, Waddell elected to purchase the property, and that the contract was then so changed as to make the $65,000 payable to the witness in ten years instead of five, and that the matter stood in that shape at the time of the hearing, although the complainant's counsel produced and offered in evidence two quit claim deeds, both dated November 4, 1889, purporting to be executed by Ann White, by Alexander White, her attorney in fact, to Waddell, conveying to him the properties in Alexander's hands for sale. The witness further testified that he made no report of the contract to his mother in her lifetime, she then being in such infirm health as to be unable to attend to business, and that he had made no report of it to her legal representatives since her death. Upon this evidence, the court held the witness incompetent, and excluded the question asked.

The defendants' counsel then offered to prove by the witness the surrounding circumstances attending the execution of the deed of July 14, 1883; that the matter of executing that deed was talked over by all the grantors among themselves several times; that all agreed that it was the proper thing to do, and that it would have been better if their father had willed all the estate to their mother, leaving her to make such disposition of it as she saw fit; that in view of the fact that it was being dissipated, and that there was no one who seemed qualified to preserve it, and of the fact that their mother was as largely instrumental in acquiring it as was her

husband, and was abundantly able to take care of her chil-
dren, they were willing to trust her with the absolute title to
the property, to make such disposition of it as she saw fit,
the same as though it had been willed to her by her husband;
that the deed was executed with that purpose on the part of
all the grantors, including Annie C. White, and that it was
talked over with her, and that she participated in the talk on
those occasions, and voluntarily and without any dissent or
expression of dissent, joined in the deed with the rest; that
she was not urged to sign it; that her mother never said a
word to her by way of urging her to sign it, or to any of the
other children, and that the only thing the mother did was to
accept the deed after the children had voluntarily determined
to execute it; that the defendants also proposed to prove by
the witness the execution and contents of the deed as a lost
deed; that it was delivered to their mother, Ann White, and
was retained in her possession, but that on examination made
after her death, it could not be found; that also, in addition
to the special matters thus offered to be proved, the defend-
ants claimed the right to make the witness a general witness
in the case as to all material matters. These offers were all
overruled, and the court adhering to his decision that the wit-
ness, by his testimony upon his *voir dire* had shown himself
to be incompetent, the defendants were not permitted to ex-
amine him further.

The questions presented by the ruling of the court exclud-
ing this witness are the only ones which we feel called upon
to consider. Alexander Ross, who upon the death of his wife,
was substituted as complainant, prosecutes the suit as the
legatee and devisee of a deceased person. If then it be con-
ceded that the case is one where the disqualification of the
witness by reason of interest is not removed by section 1 of
the "Act in regard to evidence and depositions in civil cases,"
the question remains whether he is shown to be disqualified
under the rules of the common law.

In chancery, a defendant was always competent to testify in behalf of a co-defendant, on any question in the decision of which he had no interest, and, as was held in *Bradshaw* v. *Combs,* 102 Ill. 428, the passage of the statute above mentioned has in no manner impaired that rule. In that case it is said: "Before the passage of that act, by the rules and usages of courts of chancery, one defendant was held competent to testify in behalf of a co-defendant on any question in the decision of which he had no interest. The passage of that statute has in no manner impaired that rule. The first section abolishes all disqualifications of a witness by reason of interest, as a party or otherwise, except as thereafter stated in the act. The qualifications thereafter found are mere limitations upon the effect of that act in rendering witnesses competent in cases wherein they had been incompetent. Nothing in the act contained indicates an intention to render any witness incompetent in any case where, in the absence of the statute, he was and had been competent."

In *Smith* v. *West,* 103 Ill. 332, the court, in discussing the rule as it exists independently of the statute said: "Under the practice in chancery, a defendant might always testify for a co-defendant, if his evidence did not necessarily involve his own interest, otherwise a complainant could have prevented a witness from testifying, simply by making him a defendant to the bill." So, in the early case of *Dyer* v. *Martin,* 4 Scam. 146, the doctrine was stated as follows: "In a court of chancery a witness is not necessarily incompetent because he is a party to the record. Here the inquiry is not so much whether the name of the witness appears upon the record, as whether he is in fact swearing to promote his own interest. The sources resorted to for the purpose of ascertaining the truth are much more numerous in courts of chancery than in courts of law. * * * Nor is it a fatal objection that he has an interest in the event of the suit; but his interest must be against the party whose interests are sought to be prejudiced

by his testimony; and even when the witness has an interest in favor of the party calling him, he may still be competent, if it appear that he has an equal interest on the other side. Then his interests are equally balanced, and his mind is in a state of equipoise, which leaves him indifferent to the result, as if he had no interest in the event."

The interest disclosed by the witness in his examination on his *voir dire,* and which the court below held to be a disqualifying interest, grows out of the fact that, acting under a warrant of attorney from his mother empowering him to sell and convey certain of the real estate, the title to which stood in his mother's name, but which formerly belonged to her husband's estate, he sold and conveyed the same for $65,000, taking a contract running to himself individually, and has failed to account to his mother or her representatives, or to any party in interest, for either the property or its proceeds. It will not be denied that this evidence tends to charge the witness with a liability to account to the equitable owners of the property sold, whoever they may be, for the purchase price of the land.

But it is legally a matter of indifference to him whether he accounts for the entire price to the representatives of his mother, or for the share which as is now claimed equitably belonged to Annie C. White to her legal representative, and to the representatives of his mother for the residue only. It is clear that he can be compelled to account for the money but once, and the measure of his liability is in no way affected by any controversy as to the parties to whom the money equitably belongs. It should be noticed that the witness sets up no claim to any right to hold the money as his own or for his own benefit, but practically admits his accountability for it to the owner or owners of the property sold, and we are unable to see why, as between those parties, his interest is not equally balanced, so as to place him in a position of indifference between them.

Nor does it seem to us to be material, so far as this question is concerned, that the contract between the witness and Waddell, by which the latter agreed to pay the agreed price in ten years with interest, run to the witness personally. That fact may perhaps have some bearing upon the liability of the witness to account for the price to the equitable owners of the land. It may be regarded as a present conversion of the money by the witness to his own use, so as to render him liable to account for it without waiting for its maturity by the terms of the contract of sale. But it has no bearing, so far as we are able to see, upon the question as to the parties to whom the accounting is due, whether wholly to the representatives of Mrs. White, or partly to them and partly to the complainant as the representative of his deceased wife.

But the counsel for the complainant allege interest on the part of the witness in the event of the suit growing out of matters not disclosed upon the *voir dire* examination, but shown *aliunde* by the evidence in the record. In the first place, it is claimed that the execution by Annie C. White of the deeds of July 14, 1883, and of January 18, 1888, was induced and brought about by a conspiracy on the part of her mother, brothers and sisters to rob her of her patrimony, and that the charge that the witness was one of the parties to the conspiracy, creates in him an interest in the event of the suit which should be held to be a disqualification. The scope of the bill is to set aside the conveyances by which Annie C. White parted with her interest in her father's estate, and for an accounting. As the conveyances which the bill seeks to have vacated were all made to Mrs. White and not to the witness, it is difficult to see how he has any legal interest in the question whether these conveyances are set aside or not, or how he is under any legal liability to account for the uses, profits or proceeds of the interests thus conveyed. He was in no way responsible for the acts of his mother, and he has succeeded to no part of her estate, either by descent or devise.

The allegations in the bill of a conspiracy, to which Alexander White, the witness, was a party, are not made as furnishing any independent, substantive ground for relief, but they are put forward simply as a part of the evidentiary facts tending to show that the grantor in the conveyances which the bill seeks to have set aside was imposed upon, and the execution of those deeds procured by fraud and imposition, the relief sought being the vacation of those deeds. But their vacation, as has already been observed, is a matter with which the witness legally has no concern, and as no claim for any other form of relief is, or, so far as we can see, can, under the present pleadings, be based upon the existence of the alleged conspiracy, the pecuniary interests of the witness can in no way be affected by proof of the conspiracy, or of his complicity as a member of it. Even if it be true that in a proper form of action and under proper pleadings, the party injured by such conspiracy as the one alleged might recover damages for his injury, no attempt is made in this suit to recover such damages, nor is the bill framed on that theory.

Again, it is claimed that the witness has an interest in the event of the suit growing out of the payment by Mrs. White of the Cotzhausen judgments. The contention is, that he should be compelled to account in respect to the moneys thus paid on his behalf, and that the amount paid should be charged primarily upon his share in the estate of his deceased sister Margaret, thus relieving Annie C. White's share in her father's estate to that extent from the burden of that payment. Alexander White, at the time of the execution by his brother and sisters to their mother of the deed on July 14, 1883, also executed to her a deed conveying his share in the estate of his deceased sister Margaret, and since that time has had no interest in that estate. Whether the property inherited by him from Margaret should be primarily charged with the money paid on the Cotzhausen judgments or not, is therefore a question between the legal representatives of Mrs.

White and the complainant as the representative of his deceased wife,, and is one in which Alexander has no pecuniary interest. If it is admitted that he is liable to account for the moneys paid in extinguishment of his liability to Cotzhausen, that liability, on the accounting, will be to those upon whom the burden of that payment ultimately falls, and it is a matter of indifference to him how, as between them, that burden is adjusted. As between them, his interest is equally balanced.

Again, his interest in the event of the suit is sought to be made out from the fact that he received from his mother a certain compensation or allowance for a considerable time prior to the commencement of the suit, while residing in the city of New York, having been sent there, as is claimed, by his mother, brother and sisters, to keep a watch upon his sister Annie, and to prevent, if possible, her intended marriage with the present complainant. Whatever may be said of the propriety or wisdom of the services rendered, we see no ground upon which he can be called upon to pay back the compensation received by him therefor. If any stranger had been employed by his mother in a like capacity, no one, we presume, would insist that the compensation paid him could be recovered back, and we see no reason why Alexander should be held to stand in a position at all different from that of any other employe. If Mrs. White, for purposes of her own, saw fit to employ her son in that manner and to pay him for the services rendered, the accounting for the moneys thus expended, if one is to be had, must be with her estate, and not with her employe, and in that accounting, he is in no way pecuniarily interested.

There can be no doubt that the evidence of this witness was material and important, and that its exclusion was prejudicial to the defendants. For the error in excluding it, the decree will be reversed, and the cause will be remanded to the Circuit Court for a rehearing.

*Decree reversed.*